# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 4, 2013

## STATE OF TENNESSEE v. WARREN HILDRED

**Appeal from the Criminal Court for Shelby County**
**No. 11-03840      Paula Skahan, Judge**

**No. W2012-01032-CCA-R3-CD  - Filed June 27, 2013**

The defendant, Warren Hildred, appeals his Shelby County Criminal Court jury conviction of second degree murder, challenging both the exclusion of certain evidence and the sufficiency of the convicting evidence.  Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which and JEFFREY S. BIVINS, J., joined.  THOMAS T. WOODALL, J., concurs in results.

Eric Mogy (on appeal); and Juni S. Ganguli (at trial), Memphis, Tennessee, for the appellant, Warren Hildred.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Christopher L. West and Douglas Carriker, Assistant District Attorneys General; for the appellee, State of Tennessee.

## OPINION

In the early afternoon of February 19, 2011, the defendant fatally shot the victim, Stephanie Brown, at the defendant's residence in Memphis.  The Shelby County grand jury charged the defendant with second degree murder, and the trial court conducted a jury trial in March 2012.

At trial, Charlene White testified that she and the victim had been friends for eight years.  On February 19, 2011, Ms. White and her boyfriend, Andre Jones, drove the victim to the defendant's house to retrieve some of the victim's belongings.  Specifically, the victim, who was a diabetic, was in need of her insulin medication, as well as the battery charger for her cellular telephone.

When the group parked in front of the defendant's house, they saw the defendant and his and the victim's three-year-old son exiting the defendant's car, which was parked in the driveway. The defendant and his son immediately went inside the house and shut the front door. The entrance to the house was described as having two doors: a wrought iron storm door in front of a wooden interior door. The victim walked to the front door of the house and knocked on the storm door. Ms. White, who was seated in the passenger seat of Mr. Jones's vehicle, could see the front door and could hear the conversation between the victim and the defendant because the car windows were down.

Ms. White overheard the victim ask the defendant through the closed storm door to get her medicine. The defendant responded by closing the wooden door. The victim knocked again. The defendant opened the storm door, threw some of the victim's clothes on the front porch, and closed the door again. Before closing the door, his son ran outside. At this point, Ms. White exited the car and walked toward the house. The victim again knocked on the door and asked for her medicine and battery charger. Ms. White described the victim as looking unwell and sweating profusely. The defendant then opened the door a third time and fired a single gunshot at the victim. The victim fell on the front porch, and the defendant retreated into his house and sat down on his living room sofa. Ms. White testified that the victim never opened the front door and never stepped inside the defendant's house. Ms. White called 9-1-1 while Mr. Jones attended to the victim. Emergency personnel arrived approximately ten minutes later.

On cross-examination, Ms. White denied that she or the victim had used any drugs on the day before the shooting. Although Ms. White maintained that the defendant never gave the victim her medicine, she admitted that photographs of the crime scene showed the victim's medication on the front porch of the house. Ms. White stated that the defendant must have placed the medication outside after the shooting and before emergency personnel arrived on the scene. Ms. White also admitted that the victim had been yelling loudly at the defendant for approximately five minutes before the shooting.

Andre Jones, the victim's first cousin, testified that he, Ms. White, and the victim had been driving around on the morning of February 19 when the victim began feeling ill and stated that she needed her medicine. Mr. Jones stated that he stayed in his car until the victim was shot and that, although he couldn't hear the victim's conversation with the defendant, he had a clear view of the defendant's front door. After the shooting, he exited his car and ran to the victim. He testified that the victim never went inside the defendant's house.

During cross-examination, Mr. Jones admitted that the first time he told anyone that he saw the shooting was a few days prior to trial. Before that time, he had only told

officers that he heard the gunshot. Mr. Jones denied that the victim was banging on the door and stated that the victim was simply "reaching for the door" when the defendant opened it and shot her. He stated that the victim "didn't get a chance to put her hand on the door." Mr. Jones also denied that the victim and Ms. White were taking drugs the night before the shooting, but he did admit that the victim "does dope." Mr. Jones testified that none of the medical items photographed at the crime scene were present on the defendant's front porch at the time of the shooting.

Memphis Police Department ("MPD") Officer Michael Pickens testified that he was the first to respond to the report of a shooting at the defendant's residence on February 19. When he arrived, Ms. White informed him that the defendant was standing inside the front door of his house and that he had shot the victim. Officer Pickens confirmed that the defendant was unarmed, and he then began attending to the victim until medical personnel arrived. He testified that the victim was lying on her left side on the front porch of the house. Once medical personnel arrived, Officer Pickens turned his attention to the defendant. The defendant told him that the victim "tried to break in, and [he] shot her." At Officer Pickens's request, the defendant informed him of the location of the firearm, which officers located in a bedroom dresser drawer. MPD officers then took the defendant into custody.

MPD Officer J.R. Rector, a crime scene investigator, testified that he photographed the crime scene on February 19, and he identified photographs showing, among other things, a glucose meter, test strips, and bottles of the victim's medicine that were located on the front porch of the defendant's house. He also photographed the storm door latch and testified that "the holes are enlarged" and that the latch "might possibly have been repaired at some point in time." In addition, Officer Rector testified that he recovered a .22 caliber revolver with five live rounds of ammunition and one spent shell casing from the crime scene.

Doctor Miguel Laboy, Assistant Medical Examiner for Shelby County, performed the victim's autopsy. He testified that the victim had suffered a gunshot wound to her upper left abdomen. He stated that the victim's toxicology report indicated the presence of cocaine metabolite, but he was unable to determine how recently the victim had used cocaine. Doctor Laboy opined that the victim's cause of death was the gunshot wound to the abdomen and that the manner of death was homicide.

MPD Sergeant R.M. Edwards conducted the defendant's initial interview after his arrest on February 19. The defendant signed a waiver of his constitutional rights after being provided *Miranda* warnings. In that interview, the defendant stated that the victim called him on the morning of February 19 and indicated that she needed to retrieve her

medicine, battery charger, and other items from his house. The defendant told her not to come to his house and that he would bring the requested items to her instead. When the victim arrived at his house sometime later, he went inside the house and locked the storm door. He got the victim's medicine and a pair of her boots, and he then opened the storm door and placed the items on the front porch. The victim then asked for her battery charger. The defendant again locked the storm door and turned away to find the charger. He stated that, at that point, the victim "must have gotten mad and she started pulling on the door." He claimed that he "got panicky" because he knew "what she'll do." The defendant stated that when the victim stepped inside the house, she had a "blue object in her hand," and he "pulled the pistol and shot her." According to the defendant, the victim "had the look in her eyes," and he "didn't know what she was going to do," which prompted him to shoot her. When asked if the victim was inside the house when he shot her, the defendant stated that she was approximately five steps inside the residence. After he shot her, the victim "fell back out the door" but was "still inside the house when she fell." Sergeant Edwards asked the defendant why the victim was still trying to get inside his house when she had everything she had asked for with the exception of her battery charger, and the defendant replied that "it might have been something [he] said," because he told her that "all her children [had been] taken away because she [was] on drugs."

Sergeant Edwards testified that he examined the storm door and its latch on February 19, and he determined that the latch was intact. Although it appeared that the latch screws had been moved around a bit, the door was latching properly when he examined it. He found no evidence of any forced entry.

MPD Officer Isreal Taylor testified that he was with the homicide bureau and was assigned as the defendant's case coordinator. He conducted a second interview with the defendant on February 21, after the defendant again signed a waiver of his constitutional rights. In that interview, the defendant stated that he had known the victim for approximately ten years, that he had been romantically involved with the victim, and that they had lived together at the defendant's residence for the past two years. The victim was not living with him at the time of the shooting, apparently due to their tumultuous relationship. When asked about his history with the victim, the defendant stated that the victim "has been out of control, enraged, forceful, demanding, and told [him] if [he] ever went to sleep, she would go get [his] mother's gun and shoot [him] in the back of the head." The defendant had seen the victim the night before the shooting at Ms. White's apartment.

The defendant stated that, on February 19, he and the victim began arguing over the victim's clothes, at which point he "went and got her stuff and sat it on the porch." He then apparently retrieved the gun from a closet and placed it on the coffee table in his living room "because [he] feared for [his] life." The defendant stated that the victim told him

-4-

that he "was not going to drive the car no more" and that Mr. Jones left the car to bring the victim a box cutter. Before shooting the victim, the defendant noticed a "rag tipped" comb in the victim's hand, which was "long, pointed, and blue." The defendant believed that the victim was going to use the comb as a weapon "[b]ecause of previous incidents." He stated that the victim "had struck him with a knife" on an earlier occasion and he "feared for [his] life." He admitted that he meant to shoot the victim but stated that he did not mean to kill her. He told the officer that he "just pulled the pistol out and pulled the trigger" and that he "wasn't really aiming." After shooting the victim, he placed the gun on the coffee table and called the MPD on its non-emergency number.

On cross-examination, defense counsel began to question Officer Taylor about the history of domestic violence between the defendant and victim, prompting an objection by the State's attorney. The following bench conference was held outside the presence of the jury:

| | |
|---|---|
| State's Attorney: | This is not the proper way to put it in. He's calling for hearsay testimony about prior incidents that were investigated by other officers he was not present for. Just because he reviewed a report does not make it any less hearsay. |
| Trial Court: | Let me hear the rest of the question. |
| Defense Counsel: | With respect to the domestic violence history that Mr. Hildred described in the statement, were you able to verify any of that. |
| Trial Court: | I think you're opening up a whole can of worms with that question. You don't know what his answer is going to be, do you? |
| Defense Counsel: | I'll move on. |

Defense counsel did not question Officer Taylor further about any domestic violence issues.

With this evidence, the State rested its case. Following a *Momon* colloquy, the defendant elected to testify. *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999). The

defendant testified that, in February 2011, he and the victim were "somewhat" living together. He explained that their relationship ended over his receiving custody of their son. On February 18, the defendant allowed the victim to take their son to Ms. White's house for a birthday party. The victim did not return the child to the defendant's home by 10:30 p.m. as promised, which led to a verbal altercation over the telephone. The defendant eventually drove to Ms. White's house at 2:00 a.m. on February 19 to retrieve his son. The defendant told the victim, in no uncertain terms, that she was to stay away from his house.

Later in the morning of February 19, a friend of the defendant's visited his house to inform him that the victim was ill and in need of her diabetes medication. The defendant began to gather up the victim's belongings, and he told his friend to contact the victim and tell her that the defendant would deliver the items to her. While the defendant was cleaning out his car, the victim arrived at his house with Ms. White and Mr. Jones. The defendant grabbed his son and went back into this house because he believed trouble was afoot.

When asked why he was concerned when the victim arrived at his house, the defendant explained that the victim had been violent toward him in the past. He testified that she once "busted [him] in the head with a brick," cracking his skull and requiring hospitalization. The victim was arrested over this incident, and the defendant took out a restraining order against her. On another occasion, the victim attempted to stab him with a knife and told him "if [he] went to sleep she's going to do something to [him]." The defendant also testified about an incident when the victim shoved him against the concrete corner of his house, tearing his rotator cuff.

The defendant's testimony regarding the events leading up to the shooting is somewhat unclear. The defendant offered conflicting statements about the order in which he placed the victim's items on the front porch and on which occasions the storm door was unlocked. The defendant was clear, however, that the victim was threatening to cut the tires on his car. Before the victim approached the front door the first time, the defendant saw her using the tip of the blue "rat tail" comb in an attempt to let the air out of his tires. The defendant testified that the comb wasn't working, so Mr. Jones exited his car and handed the victim a "silver object." At some point, the victim allegedly told the defendant, "I'm going to show your ass something." He took this as a threat and retrieved his handgun from the bedroom. Although the timing is unclear, the victim "snatched" the door open and began approaching the defendant with the blue comb. The defendant testified that the victim was cursing at him and "looking crazy." Although he knew the object in her hand was a comb, he was afraid she was going to use it as a weapon. Once she was four or five feet inside his house, he grabbed the gun and fired one shot at her. He stated that he wasn't trying to kill the victim, he was just "trying to wound her, get her off on [sic] me." As soon as he fired the

shot, he put the gun down and called the police. When asked why he called the non-emergency telephone number, the defendant responded that, because he had called 9-1-1 so often in the past, he had been asked not to call anymore. When his call was answered at the non-emergency number, he was informed that the police were already on their way. The defendant testified that, following the shooting, the victim "turned and walked back out the door." She fell on his front porch, but one of her feet was partially inside the house, preventing the storm door from closing completely.

Following the defendant's testimony, defense counsel attempted to call Shelby County criminal court records keeper, Melissa Horner, to introduce evidence of the victim's prior felony conviction. The State objected, and a bench conference ensued outside the presence of the jury. Ultimately, the trial court ruled the evidence inadmissible but allowed the defendant to make an offer of proof. Through Ms. Horner, defense counsel introduced the judgment and affidavit of complaint against the victim. The affidavit of complaint alleged that, on April 15, 2003, the victim and a third party, Joy Jones, engaged in a verbal altercation at Ms. Jones's residence. The victim walked away from Ms. Jones and went downstairs to the kitchen. While the victim was attempting to open a can of "baby milk" with a steak knife, Ms. Jones entered the kitchen and began "tussling" with the victim. The victim, who was still holding the knife, stabbed Ms. Jones under the right arm. In March 2006, the victim was convicted of reckless aggravated assault. Following this offer of proof, the defense rested its case.

The jury convicted the defendant of second degree murder. The trial court conducted a sentencing hearing and imposed, on April 17, 2011, a sentence of 17 years. Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by excluding testimony of prior acts of domestic violence between the defendant and the victim, as well as by excluding evidence of the victim's prior felony conviction. In addition, the defendant argues that the evidence adduced at trial was insufficient to support his conviction. We consider each claim in turn.

*I. Exclusion of Evidence*

The primary thrust of the defendant's argument on this issue is that the trial court erred by refusing to allow Officer Taylor to testify about prior instances of domestic violence between the defendant and the victim. The defendant contends that such "evidence of the victim's propensity for violence" should be allowed to establish that "the victim was in fact the first aggressor." In addition, although the argument on this point is unclear, it appears that the defendant assigns error to the trial court's decision to exclude the victim's prior felony conviction from evidence.

This court has stated that "[t]here is a distinction between evidence of prior acts of violence by the victim used to corroborate the defense theory that the victim was the first aggressor and that used to establish the defendant's fear of the victim." *State v. Ruane*, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995). If the defendant is unaware of the victim's prior violent acts, the evidence is admissible for the sole purpose of corroborating the defendant's claim that the victim was the first aggressor. *Id.* at 779, 781. The evidence cannot be used substantively, and as such, it is not controlled by Tennessee Rules of Evidence 404(a)(2) and 405. *State v. Chancy Jones*, No. W2010-02424-CCA-R3-CD, slip op. at 11 (Tenn. Crim. App., Jackson, Apr. 5, 2012), perm. app. denied (Tenn. Aug. 16, 2012); *State v. John D. Joslin*, No. 03C01-9510-CR-00299, slip op. at 69 (Tenn. Crim. App., Knoxville, Sept. 18, 1997), perm. app. denied (Tenn. Nov. 9, 1998) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 404.4 (Supp. 1996)). If, however, the defendant seeks to introduce evidence showing a reasonable fear of the victim, the defendant may testify to those violent acts perpetrated by the victim of which he or she is aware. Ruane, 912 S.W.2d at 779.

Before a trial court can admit evidence of the victim's prior violent acts to corroborate the defendant's claim that the victim was the first aggressor, three requirements must be satisfactorily met: (1) the issue of self-defense must be raised by the proof and not simply by statements of counsel; (2) there must be a factual basis for the defendant's claim that the victim had first aggressor tendencies; and (3) the probative value of the evidence must outweigh the danger of unfair prejudice. *Chancy Jones*, slip op. at 11; *State v. Lateral Jolly*, No. 02C01-9207-CR-00169, slip op. at 9-10 (Tenn. Crim. App., Jackson, Dec. 15, 1993).

In the instant case, the defendant first sought to introduce, through Officer Taylor, apparent proof of prior incidents of domestic violence between the victim and the defendant. The State properly objected to hearsay, noting for the trial court that the previous incidents were not investigated by Officer Taylor but rather by other police officers. Prior to ruling on the State's objection, the trial court cautioned defense counsel about "opening up a whole can of worms" with his question and inquired whether counsel knew how the officer would respond to the question. Rather than defend his position, defense counsel simply replied, "I'll move on." Not only was the evidence he attempted to introduce improper hearsay, but he made no further efforts to introduce incident reports through other witnesses. Thus, he cannot now be heard to complain about the exclusion of this evidence when he clearly abandoned his efforts to bolster the defendant's defense through the introduction of the evidence.

Moreover, the defendant himself testified to three separate incidents in which the victim had been violent toward him: the occasion on which the victim hit him in the head with a brick, resulting in the victim's arrest; the incident in which she attempted to stab the

defendant with a knife; and the time in which she shoved the defendant against the corner of his house, tearing his rotator cuff. Although the defendant did not introduce arrest warrants or incident reports stemming from these acts of violence, he was able nonetheless to place this evidence before the jury through his own testimony, which belies his claim that the evidence never came before the jury.

Turning now to the defendant's apparent assignment of error to the trial court's exclusion of the victim's prior felony conviction, we first note that the defendant was unaware of either the conviction or the facts surrounding it. At trial, the defendant testified to the violence perpetrated against him at the hands of the victim. Following this testimony, defense counsel inquired as to whether the victim "had done anything to anybody else." The defendant responded, "Not that I know of." Defense counsel inquired, "Are you sure about that?", prompting an objection to leading by counsel for the State, which the trial court sustained. Defense counsel did not question the defendant further on his knowledge of any violent acts committed by the victim against others. Thus, the defendant was unaware of any prior violent acts, and any evidence of such acts could only be admitted to corroborate the defendant's position that the victim was the first aggressor. *See Ruane*, 912 S.W.2d 779, 781.

When defense counsel later attempted to introduce evidence of the victim's prior felony conviction of reckless aggravated assault through the testimony of Ms. Horner, the State objected, and the trial court held a bench conference. Clearly, the prerequisite of proof of self-defense had been established through the testimony of the defendant. The trial court, after reviewing the circumstances surrounding the conviction, determined that the victim was not the first aggressor. "Rather than considering the record of conviction alone, the trial court must determine the underlying facts of the alleged act of aggression." *Laterral Jolly*, slip op. at 8. The trial court determined that the admission of the conviction and its underlying facts would be "really misleading" to the jury, and the trial court effectively found that the prejudicial impact of this evidence would outweigh any probative value. We hold the trial court did not err in excluding this evidence.

The defendant is not entitled to relief on this issue.

*II. Sufficiency of the Evidence*

The defendant also contends that the evidence is insufficient to support his conviction of second degree murder. We disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the evidence supports the defendant's conviction of second degree murder. The evidence established that he shot the victim, who was armed only with a comb, one time in the abdomen. Although the defendant claimed that he shot the victim in self-defense, the jury rejected this testimony, as was its prerogative.

*III.  Conclusion*

The trial court did not err by excluding evidence of the victim's prior felony conviction, and the evidence is sufficient to support the defendant's conviction of second degree murder. Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

-10-